In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00039-CR
______________________________


NICHOLAS DURAN BALLARD, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 28,413-B


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N
            In an unusual sequence of events, Nicholas Duran Ballard kidnapped his former girlfriend,
Leigh Anne Lambeth, at gunpoint, forced her to accompany him to his house, had admittedly
consensual sex with her, and then asked her to accompany him in a car on a local bill-paying
trip—even leaving her alone in the passenger seat of the car two times during the trip while he went
into businesses to pay bills. This appeal, after a somewhat labyrinthine path through the courts,



involves solely Ballard's complaint that, tried for aggravated kidnapping, he failed to get a reduced
punishment under Section 20.04(d) of the Texas Penal Code because the trial court failed to find that
Ballard voluntarily released Lambeth in a safe place.


 Ballard challenges the sufficiency of the
evidence to support the trial court's finding. We find the evidence sufficient and therefore affirm. 
To explain how we reach that conclusion, this opinion addresses (1) the standards and scope of our
review; (2) whether, under Section 20.04(d), one "releases" his or her kidnapping victim by just
making it easy for him or her to escape, or, in other words, reduces the restraints on the victim; and
(3) the sufficiency of the evidence.
1. The Standards and Scope of Our Review
            It is generally accepted that the burden of proof at trial dictates the standard of appellate
review. Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004); Howard v. State, 145 S.W.3d
327, 333 (Tex. App.—Fort Worth 2004, no pet.). Ballard bore the burden of proving this defensive
issue by a preponderance of the evidence. See Tex. Pen. Code Ann. § 20.04(d). There is also
agreement among the courts of appeals that the proper standard of factual sufficiency review—where
the defendant has the burden of proof by a preponderance of the evidence—is whether, after
considering all the evidence relevant to the issue at hand, the judgment is so against the great weight
and preponderance of the evidence so as to be manifestly unjust. Meraz v. State, 785 S.W.2d 146,
154–55 (Tex. Crim. App. 1990).
            But the courts of appeals split on whether a court of appeals even possesses jurisdiction to
review legal sufficiency of the evidence where the defendant bears the burden of proof by a
preponderance of the evidence. The disagreement on this issue seems to center on the Meraz court's
establishment of a standard for reviewing factual sufficiency of the evidence on an issue where a
defendant has the burden of proof by a preponderance of the evidence.
            In Meraz, the appellant challenged a jury's determination that he was competent to stand trial
on charges of sexual assault of a child. See id. at 147. The Texas Court of Criminal Appeals held
that Article V, Section 6 of the Texas Constitution conferred conclusive jurisdiction on the
intermediate appellate courts to resolve challenges to the fact-finder's failure to find in favor of a
defendant's affirmative defense. Id. The court went on to establish the widely-accepted standard for
reviewing the factual sufficiency of the evidence on this type of finding. Id.
            But the extensive discussion regarding jurisdiction over such points of error and the
appropriate standards for reviewing them left open issues regarding legal sufficiency review. The
courts of appeals have split on how to interpret Meraz on that issue. To illustrate the disagreement,
we will examine recent cases outlining our sister courts' interpretations of Meraz when an appellant
challenges the legal sufficiency of the evidence to support the fact-finder's rejection of an issue on
which the appellant bears the burden of proof.
            According to the minority view, represented by Patterson v. State, Meraz stands for the
position that the courts of appeals do not have jurisdiction to review the legal sufficiency of the
evidence on these types of issues. See Patterson v. State, 121 S.W.3d 22, 24 (Tex. App.—Houston
[1st Dist.] 2003, pet. dism'd).


 Under this interpretation, when a defendant seeks appellate review
of a fact-finder's failure to make a finding on which the defendant has the burden of proof, such as
on an affirmative defense, the defendant invokes the appellate court's factual sufficiency review
jurisdiction. Id.; Naasz, 974 S.W.2d at 421. Because, the Patterson and Naasz courts held, the
courts of appeals have no legal sufficiency review jurisdiction in this situation, each overruled the
appellant's legal sufficiency point of error and went on to address the factual sufficiency issue. See
Patterson, 121 S.W.3d at 24; Naasz, 974 S.W.2d at 421.
            On the other hand, the majority of the intermediate appellate courts does not read Meraz to
exclude a legal sufficiency review of the evidence. See Howard, 145 S.W.3d at 332.


 Because
Meraz draws from civil law in linking factual sufficiency review of a rejected affirmative defense
to the preponderance of the evidence burden of proof at trial, the Howard court concluded the
appropriate legal sufficiency standard of review is likewise found in civil law, in cases in which the
burden of proof at trial is proof by a preponderance of the evidence. Id.; Sterner v. Marathon Oil
Co., 767 S.W.2d 686, 690 (Tex. 1989).
            Under the civil standard of review, an appellant challenging the legal sufficiency of the
evidence to support an adverse answer on which he or she had the burden of proof must satisfy two
inquiries. Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 940 (Tex. 1991). First, the record
must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. 
Second, if there is no evidence to support the finding, then the entire record must be examined to see
if the appellant's position on the issue is established as a matter of law. Id.; Sterner, 767 S.W.2d at
690.
            We agree with the Howard court that the Sterner standard is the proper legal standard of
review for a criminal defendant's legal sufficiency challenge to the fact-finder's rejection of a Section
20.04(d) sentence reduction. We conclude we are to review both the factual and legal sufficiency
of the evidence.
2. "Release" Under Section 20.04(d) Requires More than Simple Reduction of Restraints
            Aggravated kidnapping is generally punished as a first-degree felony, carrying a sentence of
five to ninety-nine years or life. Tex. Pen. Code Ann. §§ 12.32(a), 20.04(c) (Vernon 2003). At the
punishment stage of a trial, an individual convicted of aggravated kidnapping is eligible for a lesser
sentence if he or she can show by a preponderance of the evidence the individual "voluntarily
released the victim in a safe place." Tex. Pen. Code Ann. § 20.04(d). If the defendant successfully
shows this mitigating factor, the offense for which he or she was convicted becomes punishable as
a second-degree felony rather than a first-degree felony. So, on a showing of voluntary release in
a safe place, the defendant is subject to a reduced range of punishment, two to twenty years. Tex.
Pen. Code Ann. § 12.33 (Vernon 2003); Brown v. State, 98 S.W.3d 180, 181–82 (Tex. Crim. App.
2003).
            Here, Ballard argues he voluntarily released Lambeth in a safe place within the meaning of
the statute because he left her alone in the car, twice, giving her the power to escape. That requires
a close examination of the caselaw addressing "release."
            In Brown, the defendant brought the victim to the hospital only after she promised she would
claim her neck wound he caused was self-inflicted. Brown, 98 S.W.3d at 182. The trial court
concluded Brown had not voluntarily released his victim because he had been tricked or manipulated
into taking her to the hospital. Id. The Tyler Court of Appeals agreed, holding that, in order for the
action to qualify as a voluntary release, the action must be the spontaneous product of the actor's free
will, uninfluenced by another's persuasion, coercion, or solicitation. Id.
            The Texas Court of Criminal Appeals disagreed with the Tyler court, rejecting such a broad
definition and, instead, applying a narrow definition of "voluntary" under Section 20.04(d) of the
Texas Penal Code. Id. at 188. In order for the action to be voluntary, there can be no element of
rescue by police or escape by the victim. Id. The court concluded such a definition was consistent
with the legislative purpose of Section 20.04(d) to encourage kidnappers to release their victims. 
Id.
            On remand, the Tyler court concluded that, based on the narrow definition of "voluntary
release," Brown should have been subject to the lesser sentence under Section 20.04(d) although he
may have been tricked or manipulated into bringing his victim to the hospital for medical treatment. 
The Tyler court reversed and remanded the case for a new punishment hearing. Brown v. State, 109
S.W.3d 550, 551 (Tex. App.—Tyler 2003, no pet.); see also Patterson, 121 S.W.3d at 25 (kidnapper
voluntarily released children in safe place even though release may have been conditional when he
returned children to their mother based on her promise she would not call police).
            In a second case, after a road-rage episode in which a kidnapper, Carreon, chased recklessly
after a driver who cut him off in traffic, Carreon wrecked the vehicle carrying him and the two
elderly women he kidnapped. Carreon v. State, 63 S.W.3d 37, 38 (Tex. App.—Texarkana 2001, pet.
ref'd). After he began screaming at his captives to push the car out of the ditch, citizens confronted
him. Id. After one of the victims alerted the gathering crowd that Carreon was holding them at
gunpoint, the citizens scuffled with Carreon until police arrived and took Carreon into custody. Id.
            The trial court properly refused to include a jury instruction on whether Carreon voluntarily
released his victims in a safe place. Id. Concluding that the evidence did not raise the issue that
Carreon had done so, this Court overruled Carreon's point of error and affirmed the trial court's
sentence. Id. 
            Although decided before Brown, Carreon's rationale remains largely sound in light of
Brown.


 We noted in Carreon that the application of Section 20.04(d) should focus on whether the
defendant performed an act of release, not whether the victim had the means to escape. Id. at 39. 
We repeat this Court's conclusion in Carreon that an accused, in order to trigger the mitigating effect
of Section 20.04(b), "must have performed some overt and affirmative act that brings home to the
victim that he/she has been fully released from captivity." Id.; see Harrell v. State, 65 S.W.3d 768,
772 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); Hernandez v. State, 10 S.W.3d 812, 822
(Tex. App.—Beaumont 2000, pet. ref'd). That analysis is consistent with the holding in Brown that
"voluntary release" does not include rescue or escape.
            In a third case, Storr, the victim left his car running outside and entered a post office. Storr
v. State, 126 S.W.3d 647, 648, 652–53 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Inside
the post office, a masked man held a gun to the victim's head, demanded his wallet, and then ordered
him to return to the car. Id. Another masked man had entered the car and was sitting in the driver's
seat. Id. After driving to a dark, isolated area, the masked men threatened to kill the victim and
forced him into the trunk of the car when another car approached the area. Id. The men then began
driving with the victim in the trunk. Id. After being stopped for a traffic violation and gaining the
victim's cooperation and silence by threat, the men allowed the victim out of the trunk and forced
him to drive back to the post office. Id. They then got out of the car and left. Id. The victim then
drove home. Id.
            Relying on the definition of voluntary release in Brown, the Fourteenth court concluded that,
on these facts, defense counsel rendered ineffective assistance when he failed to request an
instruction under Section 20.04(d) for a reduced sentence. Id. at 653. The court held that the
evidence conclusively established the defendant had voluntarily released the victim in a safe place. 
Id. at 652.
            Thus, we review the evidence to determine whether it is legally and factually sufficient to
support the trial court's finding that Ballard did not voluntarily release Lambeth by taking some
affirmative step of release beyond merely reducing his restraints on Lambeth.
3. The Evidence Is Sufficient To Support the Finding on Release
            First, we review the evidence generally, before assessing its sufficiency and finding it legally
and factually sufficient.
            Ballard and Lambeth share a child from their prior relationship; and, although Ballard may
have married another woman sometime before the kidnapping, he had gained access to Lambeth's
email records and was angered to discover she had started a relationship with another man. On an
earlier occasion, Ballard had told Lambeth he would kill her if she had another boyfriend. According
to Lambeth, Ballard had also assaulted her and had broken into her home. 
            When Lambeth arrived at the Kilgore College campus for her classes April 5, 2001, Ballard
confronted her and kidnapped her at gunpoint. Lambeth explained her fear when Ballard approached
her with the handgun: "I was scared and I was going where [Ballard] said. I did not want him to kill
me." 
            Ballard compelled Lambeth to drive to his house in Henderson, where the two had
consensual sex.


 Lambeth's initial statement indicates that, even though Ballard no longer held a gun
on her after the two arrived at his house, he still had control over her movement and she was not free
to leave. Lambeth stated she was "scared to try to leave because [she] knew he would catch [her]." 
While the two were at Ballard's house, Lambeth admits, she wanted to leave, but Ballard would not
let her. 
            After approximately three hours at the house, Ballard then had Lambeth go with him in a car
to pay bills. Hoping he would let her go home after the errands, she accompanied him. 
            Ballard did not take his gun on the trip. Ballard left Lambeth in her running vehicle while
he went into two different locations. Lambeth stated she considered leaving him there: "I started
crossing over into the driver's seat wanting to leave him and [Ballard] returns to the car before I
could leave." She also expressed her desire to go home and her hope that, after the errands, she
could go home. At a different point, she stated she felt she was free to go and no longer felt as
though she was in danger. At the bank, she thought Ballard was no longer a threat and that she could
have escaped. Rather than being afraid of Ballard, she felt depressed and upset. 
            She no longer feared that Ballard would catch her if she left and explained it was her decision
to stay: "I could leave if I wanted to, but I didn't want to leave him there." She attributes her
remaining in the truck to her own feelings. She did not leave at that point, she said, "[b]ecause [she]
wouldn't do that to him, [she] wouldn't leave him stranded." At that point, "everything was back to
normal." To demonstrate when Lambeth felt she was out of danger and free to go, she testified to
the following:
I could have left him, you know. I didn't have to take him to town, I could have left
in the car then, I just didn't. I just felt–I didn't feel he was a threat to me at that point
and I knew he wouldn't harm me after that. I pretty much knew he wasn't going to
harm me after we talked a little while in the car on the way to his house.
            However, in her initial statement, she also stated, "I didn't leave because I just got back in
the groove that I was used to." It is unclear whether, by this statement, Lambeth meant either that
she remained with Ballard willingly or that she had acquiesced to Ballard's control and the unhealthy
dynamics of their prior relationship. So, with respect to the time frame covering the bill-paying
errands, Lambeth's initial statement contains significant evidence that, while Ballard no longer held
the weapon on her, the elements of fear and control did play a part in Lambeth's remaining in the
truck when Ballard went into the store.
            After Ballard paid bills, the two returned to Ballard's house, because he asked her to do so. 
Ballard then attempted to persuade her to call the police to tell them that she was well and that there
was no cause for concern. Lambeth refused. 
            The police arrived at the residence.


 As the police approached, Ballard physically restrained
Lambeth and tried to get her to tell the police that all was well. "[Ballard] was holding onto me and
I was trying to leave. He was grabbing my arm hard and was not going to let me leave. A few
minutes after this, I told him I had to go, and this is when the Henderson police showed up at the
house." 
            Initially, Lambeth complied with Ballard's directives, and the officers let the two drive away
from his house. Shortly after the two left, Ballard had to return to get an item he had forgotten at the
house. When separated from Ballard, Lambeth admitted to the police—still at the house—what had
happened, and they directed her to drive to the police station. She described her emotional state
when she finally admitted to the police what had happened: "I was just ready for everything to be
over with at that point, I just wanted to go home and just go home." 
            Ignoring all evidence to the contrary, we now review the evidence for legal sufficiency by
looking to the record for evidence that supports the trial court's adverse finding on this issue where
Ballard had the burden of proof by a preponderance of the evidence. See Howard, 145 S.W.3d at
333–34.
            Lambeth explained, with respect to the beginning of the ordeal, that she was going to go
wherever Ballard directed her out of fear of being killed. This fear seemed to continue on arrival at
Ballard's house, since Lambeth wanted to leave but was too frightened to do so. She expressed her
fear that Ballard would find her. She indicated that she went with Ballard to run errands with the
hope she could leave afterward, indicating that she did not feel free to leave before the errands. On
their return to Ballard's house, Lambeth's captive status became more obvious again when Ballard
held onto her when police arrived. Evidence suggests she did not feel free to go at this point since
she was too afraid to even relay the actual happenings to the police while she was in Ballard's
presence. It was only after she was apart from Ballard that she enlisted the aid of the police. 
            Based on Brown's definition of voluntary release, the evidence supports the trial court's
failure to find that Ballard voluntarily released Lambeth by temporarily leaving her in her vehicle
while he ran errands. In order for Lambeth to be free from Ballard at that time, there is evidence she
would have had to flee, leaving Ballard in the store. Such a requirement appears to fall into the
category of "escape" which, under the narrow definition advanced by Brown, will not qualify the
defendant's conduct as a voluntary release under Section 20.04. Keeping in mind the guidance from
Carreon, we are to analyze Ballard's actions rather than those of the victim or what the victim could
have or should have done in the situation.
            Like the facts before us, the kidnappers in Storr left the victim in a motor vehicle with its
motor running. In contrast, however, in Storr the kidnappers left their victim without any expressed
intent of returning to the vehicle and without evidence of knowing how to find him later or of any
continuing power over him, thus leaving that victim free to return to his home. Here, when Ballard
left Lambeth in her vehicle, the evidence suggests that he intended to return momentarily, he knew
how to find her later had she driven off, and he had some continuing power over her. In Storr, there
was no such evidence.
            We conclude there is legally sufficient evidence to support the trial court's failure to find that
Ballard voluntarily released Lambeth in a safe place.
            For our factual sufficiency review, we consider all the evidence relevant to this issue and will
determine whether the judgment is so against the great weight and preponderance of the evidence
so as to be manifestly unjust. See Meraz, 785 S.W.2d at 154–55. Having already outlined the
evidence supporting the trial court's finding, we will now add to the discussion the evidence that may
be seen to support a contrary finding.
            The evidence that would tend to support a finding that Ballard did voluntarily release
Lambeth is found in Lambeth's testimony depicting the events surrounding the trip to pay bills. She
testified Ballard left her alone in her car while he went inside. Lambeth testifed that, at the time, she
thought she was free to go and no longer felt as though she was in danger.
            Lambeth's testimony contains elements of two different scenarios, one in which Ballard
continued to control her and one in which she wanted to stay with him out of an apparent sense of
loyalty. Lambeth's own testimony may provide an explanation for these contrasting portraits. 
Lambeth reveals her bias and an interest in having changed or colored her testimony to be more
favorable to Ballard. She states that Ballard's harsh sentence caused her more pain than the ordeal
itself. She also expressed her wish that her son be able to spend time with his father. 
            Certainly, the evidence does reveal a reduction in Ballard's control over Lambeth, but never
do Ballard's actions constitute a voluntary release of Lambeth. While there is conflicting evidence
on the matter—and Lambeth's testimony is not entirely clear on whether she felt free to leave—what
is clear is that the trial court, acting as finder of fact in the face of conflicting evidence, was
authorized to believe or disbelieve any portion of the evidence.
Conclusion
            Legally and factually sufficient evidence supported the trial court's conclusion that Ballard's
actions did not constitute "voluntary release" to trigger mitigation of Ballard's punishment for
aggravated kidnapping. Here, Ballard did not communicate to Lambeth that she was free to go, and
later events when the police were involved demonstrated that she probably was, in fact, not free to
go. Ballard's act of temporarily leaving Lambeth in the vehicle may have permitted her to escape
easily, but, under Brown, allowing a kidnapping victim the ability to escape does not constitute a
release.
 
 
 
 
            Accordingly, we overrule Ballard's contention and affirm the trial court's judgment.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          January 20, 2005
Date Decided:             April 8, 2005

Publish